IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THQ INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. _____ |
| | § | |
| ZUFFA, LLC; ZUFFA MARKETING, | § | |
| LLC d/b/a "ULTIMATE FIGHTING | § | |
| CHAMPIONSHIP," "PRIDE FIGHTING | § | |
| CHAMPIONSHIP," AND "PRIDE FC; | § | |
| *and* | § | |
| ELECTRONIC ARTS INC., | § | |
| | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT

Plaintiff THQ Inc. (the "**Plaintiff**") brings this action against Zuffa, LLC and Zuffa Marketing, LLC, d/b/a "Ultimate Fighting Championship," "PRIDE Fighting Championship" and "PRIDE FC" (together, "**Zuffa**"); and Electronic Arts Inc. ("**EA**," and together with Zuffa, "**Defendants**") and alleges as follows:

### I. NATURE OF THE ACTION

1. On December 19, 2012 (the "**Petition Date**"), THQ Inc., THQ Digital Studios Phoenix, Inc., THQ Wireless Inc., Volition, Inc., and Vigil Games, Inc. (collectively, the "**Debtors**") filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2. On July 17, 2013, the Bankruptcy Court entered an order confirming the *Second Amended Joint Plan of Liquidation of THQ Inc. and Its Affiliated Debtors* (the "**Plan**"). The Plan became effective on August 2, 2013. Pursuant to the Plan, creditors have not been paid in full and

1

are owed a significant amount of money. Plaintiff is the authorized representative of the Debtors' estates to bring the causes of action asserted herein pursuant to section 6.12 of the Plan.

3. Plaintiff brings this civil action seeking to avoid, pursuant to sections 544 and 548 of the Bankruptcy Code, incorporating sections 3439.01 et seq. of the California Civil Code, 1) obligations incurred under that certain Settlement, Mutual Release, and License Agreement between THQ Inc. and Zuffa (the "**Settlement License**"), and 2) transfers of the Debtors' property pursuant to the Settlement License. In addition, Plaintiff seeks recovery of the property transferred pursuant to section 550 of the Bankruptcy Code, to impose a constructive trust, to recover damages for tortious interference with contract from EA, and to disallow Zuffa's claims against the estate.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1331 and 1334 over counts I, II, III, IV, and VII, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the reclaiming claims. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. PARTIES

5. The Plaintiff is THQ Inc., as successor-in-interest to the Debtors.

6. Defendants are Zuffa, LLC, Zuffa Marketing, LLC, Nevada limited liability companies which have filed proofs of claim against THQ Inc. in the Bankruptcy Case, and Electronic Arts, Inc., a Delaware corporation which may be served with process by serving its registered agent, the Corporation Trust Company.

## IV. BACKGROUND

7. THQ Inc. was a video game developer and publisher headquartered in California. It both developed new concepts for video games and licensed concepts from other content providers for the video game medium.

8. Zuffa operates the mixed martial arts ("**MMA**") sporting business marketed as the "Ultimate Fighting Championship" ("**UFC**"). Zuffa has filed two proofs of claim with the Bankruptcy Court numbered 417 and 671, as amended by 763.

9. EA is a video game developer and publisher. EA is well-known for its "EA Sports" brand, an umbrella under which it markets and sells sports-themed video game series such as NBA Live, FIFA, NHL, Madden NFL, and NASCAR.

10. MMA is a sport which has been growing in interest and visibility among domestic and international audiences. Zuffa and its predecessors licensed the UFC copyrights, trademarks, and other intellectual property for use in the video game medium since about 2000 (the "**UFC Franchise**"). UFC is the predominant MMA brand.

11. In 2006, EA expressed interest in acquiring the UFC Franchise from Zuffa. There had been no game released in the UFC Franchise since 2004, and UFC's popularity was beginning to skyrocket, leading to national press about its appeal to the video-game loving young male cohort. EA made what Zuffa considered to be an insultingly low offer for the UFC Franchise, which was rejected.

12. In January 2007, Zuffa entered into a letter of intent with THQ, which had successfully developed the "World Wrestling Entertainment" franchise of wrestling video games. THQ then began developing "UFC 2009 Undisputed," which it announced at the time of its initial agreement with Zuffa. Anticipation built for over two years. The agreement with

Zuffa was memorialized in an Amended and Restated License Agreement dated October 7, 2010 and a Sponsorship Agreement dated October 7, 2010 (together as amended, except pursuant to the Settlement License, the "**License Agreement**").

13. On May 19, 2009, UFC 2009 Undisputed was released. It was a smash hit, selling over 3.5 million units, many at full price, and leading to significant sales and profits at THQ, as well as industry awards and recognition.

14. Taking notice of THQ's success with an MMA game, on June 1, 2009, EA announced "EA Sports MMA." EA Sports MMA was released on October 19, 2010, and while the game was well-reviewed for its technical execution, it flopped in the market, as the game included few recognizable characters. EA had been unable to acquire the image rights for well-known MMA fighters, most of whom were part of the UFC Franchise, and marketed EA Sports MMA as a generic fighting game.

15. As soon as EA Sports MMA was released, players noticed a hidden feature allowing players to recreate UFC-licensed fighters as characters in EA Sports MMA using pre-programmed tattoos, body styles, voices, and names. As was obvious to Zuffa, EA wanted to take advantage of the growing popularity of the UFC Franchise, not just MMA in general.

16. On November 30, 2010, Zuffa objected to EA's use of UFC Franchise characters in EA Sports MMA. In March 2011, EA agreed to patch the game feature to prevent players from re-creating UFC fighters within EA's systems.

17. Throughout 2011, THQ's financial fortunes continued to decline. It dedicated significant, dwindling capital to expanding the platforms for its "uDraw" hardware gaming tablet, which was a failure in holiday 2011 sales. By the end of November 2011, THQ projected

that it would run out of capital within several months and thereafter be unable to support its major pipeline projects, including the next games in the UFC Franchise.

18. THQ began to explore strategic alternatives, including a sale of the company to private equity or an industry partner. EA was a logical party to approach, given its indications of interest in the UFC Franchise.

19. In early December 2011, EA and THQ discussed a potential sale of THQ as a whole to EA. THQ provided EA internal financial information, including detailed sales and revenue figures for the UFC Franchise, and projected marketing expenditures on the next UFC Franchise game. After a December 12, 2013 high-level meeting, several discussions, and a review of management projections, EA broke off negotiations, professing disinterest.

20. Only two weeks after the negotiations with EA broke down, Zuffa, through outside counsel, sent THQ a letter dated December 30, 2011 (the "**Demand Letter**"). Zuffa had given no prior indication of any dissatisfaction with THQ's operation of the UFC Franchise. The Demand Letter criticized THQ's marketing expenditures on the UFC Franchise, and threatened to terminate the UFC License based on THQ's insolvency. On information and belief, EA communicated THQ's internal financial information and projections to Zuffa.

21. On information and belief, prior to the Demand Letter, EA contacted Zuffa, informed Zuffa of THQ's perilous financial condition, and expressed interest in acquiring the UFC Franchise directly from Zuffa, causing Zuffa to threaten termination of the UFC License.

22. Zuffa and EA each had an incentive to terminate THQ's UFC License. Because the terms of the agreement dated to 2006, before the explosion of interest in UFC, Zuffa's terms with THQ were much less favorable to Zuffa than Zuffa would have been able to achieve in the open market in 2012. For example, THQ had no guaranteed minimum payment to Zuffa, and

had only a minimum $2 million marketing commitment, which was below the level that a game in the UFC Franchise would actually require. EA, for its part, wanted to acquire only the choicest portions of THQ rather than commit to the company as a whole as a strategic acquirer.

23. The UFC Franchise was a significant, saleable asset in THQ's gaming portfolio, with a net present value of about $20 million at the time. However, with Zuffa's determination to capture the additional value to be gained in a transfer of the UFC Franchise to EA, THQ had no choice but to seek a resolution with Zuffa.

24. THQ negotiated a termination of the UFC License with Zuffa and EA. THQ was hamstrung in these negotiations by EA's intimate knowledge of THQ's finances, which derived from EA's confidential data room access during the search for a strategic acquirer. THQ was further hindered in its attempt to get an equitable price for its rights in the UFC Franchise by the leak of the news that it planned to close the San Diego office responsible for developing the UFC Franchise.

25. On June 1, 2012, Zuffa and THQ entered into the Settlement License. Pursuant to the Settlement License, Zuffa paid THQ $10 million for (a) the termination of the UFC License and (b) the license from THQ to Zuffa of all intellectual property of THQ associated with the UFC Franchise.

26. Although the transfer of the UFC Franchise to EA was accomplished by a separate writing, it was contemplated by the Settlement License. THQ was required by the Settlement License to issue a press release congratulating EA on acquiring the UFC Franchise from Zuffa.

27. EA is in the process of developing "EA Sports UFC," a UFC Franchise game scheduled for release in 2014.

## V. CAUSES OF ACTION

### *Count I: Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B)*
**(Against All Defendants)**

28. Plaintiff incorporates by reference the allegations in paragraphs 1 – 27.

29. Pursuant to section 548(a)(1)(B) of the Bankruptcy Code, a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer or obligation and was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. 11 U.S.C. § 548(a)(1)(B).

30. The elements of a fraudulent transfer under section 548(a)(1)(B) exist in this case. First, THQ entered into the Settlement License on June 1, 2012, less than a year before the Petition Date.

31. Second, THQ received less than a reasonably equivalent value in exchange for entering into the Settlement License. The value of the UFC Franchise alone was at least $20 million, and likely worth more than that to EA, but THQ received only $10 million.

32. Third, THQ was insolvent at the time of the Settlement License. The Bankruptcy Code defines insolvency as a "financial condition such that the sum of the entity's debts is greater than all of its property, at a fair valuation..." 11 U.S.C. § 101(32).

33. There is ample evidence of THQ's insolvency at the time of the obligation incurred and later transfers, including without limitation: (i) the Debtors' audited financial statements; (ii) a court valuation; (iii) SEC filings; and (iv) Zuffa's own letter dated December

30, 2011, where it accused THQ of insolvency. In addition, Plaintiff believes that expert testimony will support the above evidence.

34.  Therefore, Plaintiff is entitled to an order and judgment under 11 U.S.C. § 548(a)(1)(B) avoiding the Settlement License and the transfers contemplated thereby.

### Count II: Constructive Fraudulent Transfer Pursuant to California Law,[1] As Made Applicable by 11 U.S.C. § 544(b)
### (Against All Defendants)

35.  Plaintiff incorporates by reference the allegations in paragraphs 1-34.

36.  Section 544 of the Bankruptcy Code allows the trustee to avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an allowed unsecured claim. *See* 11 U.S.C. § 544(b).

37.  There are numerous unsecured creditors of the Debtors, whose claims arose both before and after THQ entered into the Settlement License, and whose claims were outstanding as of the Petition Date.

38.  Pursuant to the Plan, there are creditors holding allowed unsecured claims that have not been paid in full.

39.  THQ did not receive reasonably equivalent value to enter into the Settlement License or make the transfers thereby contemplated. The value of the UFC Franchise alone was at least $20 million, and likely worth more than that to EA, but THQ received only $10 million.

40.  By June 1, 2012, and thereafter, the Debtors were insolvent. There is ample evidence of the Debtors' insolvency at the time of the obligation incurred and later transfers, including without limitation: (i) the Debtors' audited financial statements; (ii) a court valuation;

---

[1] Zuffa and EA received transfers of the Debtors' property pursuant to the Settlement License in California. If the Court finds that another state's law is applicable to the obligations and transfers alleged herein, Plaintiff asserts claims pursuant to 11 U.S.C. §544(b) under that state's law as well.

(iii) SEC filings; and (iv) Zuffa's own letter dated December 30, 2011, where it accused THQ of insolvency. In addition, Plaintiff believes that expert testimony will support the above evidence.

41. By June 1, 2012, and thereafter, the Debtors were operating with an unreasonably small capital. The Debtors projected a need to spend at least $14.8 million to market UFC 3 and $14.6 million to develop UFC 4 within fiscal year 2013. However, as of the end of fiscal year 2012, the Debtors had a working capital of only $18.7 million, as reported in their annual report.

42. By June 1, 2012, and thereafter, the Debtors were unable to pay debts as they came due. Debtors had $100 million 5% convertible senior notes due in August 2014, but knew that without a restructuring of their debts, they would be unable to make that payment. The Debtors ultimately defaulted on a $50 million line of credit in November 2012.

43. Therefore, pursuant to Cal Civ. Code § 3439.05, Plaintiff is entitled to an order and judgment avoiding the Settlement License and the transfers contemplated thereby.

### *Count III: Recovery of Avoided Transfer Pursuant to 11 U.S.C. § 550*
**(Against All Defendants)**

44. Plaintiff incorporates by reference the allegations in paragraphs 1 – 43.

45. Section 550 of the Bankruptcy Code allows the trustee to recover, for the benefit of the estate, the property transferred and avoided or the value thereof under sections 544 and 548 from the initial transferee of such transfer, the entity for whose benefit such transfer was made, or from the immediate transferee of such initial transferee. *See* 11 U.S.C. § 550(a).

46. As alleged above, Plaintiff is entitled to avoid the Settlement License and the transfers contemplated thereby pursuant to sections 544 and 548 of the Bankruptcy Code. Zuffa was the counterparty to the Settlement License and the initial transferee of the UFC Franchise, and EA was the person for whose benefit the transfer of the UFC Franchise was made, and the subsequent transferee of the UFC Franchise.

47. Thus, pursuant to section 550(a) of the Bankruptcy Code, Plaintiff is entitled to an order and judgment recovering from Zuffa and EA, jointly, the UFC Franchise, or its value, plus fees and interest.

### Count IV: Recovery of Interest
### (Against All Defendants)

48. Plaintiff incorporates by reference the allegations in paragraphs 1 – 47.

49. It is well-settled that interest upon a voidable preference recovered by a trustee in bankruptcy should be computed from the date of demand for its return or, in the absence of a demand, from the date of the commencement of the suit for recovery.

50. Accordingly, Plaintiff also requests the payment of interest on the value of the UFC Franchise dating from September 13, 2013, the date of Plaintiff's initial demand.

### Count V: Tortious Interference with Contract
### (Against EA)

51. Plaintiff incorporates by reference the allegations in paragraphs 1 – 50.

52. The UFC License was a valid and existing contract between Zuffa and THQ.

53. EA had knowledge of the UFC License.

54. On information and belief, EA solicited Zuffa to terminate the UFC License and/or informed Zuffa of THQ's financial condition, in violation of a confidentiality agreement, in order to procure the termination of the UFC License.

55. Zuffa terminated the UFC License via the Settlement License.

56. THQ was damaged by EA in an amount to be determined at trial, but consisting of at least $10 million.

### Count VI: Constructive Trust
### (Against EA)

57. Plaintiff incorporates by reference the allegations in paragraphs 1 – 56.

58. Pursuant to Cal. Civ. Code § 2223, one who wrongfully detains property of another is an involuntary trustee for the benefit of the owner.

59. EA has wrongfully detained the UFC Franchise, which it received as a result of a known fraudulent transfer and/or its tortious interference with the UFC License.

60. EA is the trustee of the UFC Franchise for the benefit of Plaintiff.

61. EA is liable to Plaintiff for an accounting of the UFC Franchise.

62. EA is liable to Plaintiff for the profits of the UFC Franchise.

### *Count VII: Disallowance of Claims*
### (Against Zuffa)

63. Plaintiff incorporates by reference the allegations in paragraphs 1 – 62.

64. Pursuant to 11 U.S.C. § 502(d), the Court shall disallow the claim of an entity holding recoverable property or that is a transferee of an avoidable transfer.

65. Zuffa's claims numbered 417, 671, and 763 should therefore be disallowed.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that, upon trial of this matter, the Court: (i) enter judgment in favor of Plaintiff avoiding the Settlement License and contemplated transfers pursuant to sections 544 and 548 of the Bankruptcy Code against Zuffa and EA, jointly and severally; (ii) allow Plaintiff to recover such avoided transfers, or the value thereof pursuant to section 550 of the Bankruptcy Code from EA and Zuffa, jointly and severally; (iii) award Plaintiff attorney's fees and costs incurred in connection with the preparation and prosecution of this Complaint; (iv) award Plaintiff interest on the value of the UFC Franchise from September 13, 2013 to the date of judgment, (v) award Plaintiff its actual damages from EA, (vi) declare EA the trustee of the UFC Franchise for the benefit of Plaintiff, (vii) order an accounting of the UFC

Franchise from EA, (viii) order EA to turnover the profits of the UFC Franchise, and (ix) disallow Zuffa's claims. Plaintiff further requests that the Court award Plaintiff such other and further relief, both at law and in equity, to which it is justly entitled.

Dated: October 4, 2013  Respectfully submitted,

ROSENTHAL MONHAIT & GODDESS, P.A.

By: _____
Norman M. Monhait (#1040)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, Delaware 19801
TEL: (302) 656-4433
FAX: (302) 658-7567
nmonhait@rmgglaw.com

and

**GRUBER HURST JOHANSEN HAIL SHANK LLP**
G. Michael Gruber
Jeffrey R. Erler
Laura M. Fontaine

1445 Ross Avenue, Suite 2500
Dallas, TX 75202
Telephone: (214) 855-6800
Facsimile: (214) 855-6808
Email: mgruber@ghjhlaw.com
    jerler@ghjhlaw.com
    lfontaine@ghjhlaw.com

*ATTORNEYS FOR PLAINTIFF*
*THQ Inc.*